[Civil No. 3484. Filed June 8, 1936.]

[58 Pac. (2d) 515.]

J. F. TURPIN and MRS. J. F. TURPIN, Husband and Wife, Appellants, v. MIKE KRUTTON, Appellee.

Mr. Terrence A. Carson, for Appellants.

Mr. L. C. McNabb, for Appellee.

McALISTER, J.—The plaintiff below, Mike Krutton, brought an action against J. F. Turpin and wife to recover damages for his forcible eviction from certain premises held by him under lease and from a judgment in his favor entered on the verdict of a jury and the denial of their motion for a new trial the defendants have brought the matter here for review.

The complaint alleges in substance that prior to July 10, 1932, the defendants were the owners of a service station located at Six Points in the city of Phoenix and that for the purpose of serving their customers with food and soft drinks they had in connection with that station a small eating and cold drink stand which was being run at the time by a Mr. Kelly who desired to sell the privilege of running the business and with it his stock and a radio he had in the stand; that after ascertaining from the defendants that by paying a rental of $10.50 a week he could have a lease thereon as long as they ran the service station, he purchased the business, including the stock and the radio, from Mr. Kelly for $150, took possession on the 10th day of July, 1932, and ran it until October 9th thereafter, when the defendants ordered him to leave the premises; that he refused and the defendants thereupon forcibly evicted him by unlawfully, wrongfully and forcibly taking possession of the stand against his will by threatening to kill him if he returned to the stand, and by cutting off its lights and gas; that by reason of this forcible eviction he was damaged in the sum of $2,500 and as a result of the wanton and unwarranted exercise of dominion over the property he was entitled to punitive damages in the sum of $1,000.

After filing certain preliminary motions the defendants demurred to the complaint and denied generally its allegations. The demurrer being overruled, the case went to trial before a jury which returned a verdict for the plaintiff in the sum of $400 and judgment in that amount was entered.

There are ten assignments and the first is that the court erred in overruling the defendants' general demurrer to the complaint upon the ground that it does not allege that at the time of his eviction he was,

(1) rightfully in possession, (2) not in default under the terms of his agreement, and (3) had any duty owing him from the defendants or a breach thereof. The correctness of this ruling is not material at this time, because the question whether the plaintiff was in default on the payment of rent was gone into fully at the trial without objection, both on direct and cross-examination, the parties thereby treating the complaint as though it contained an allegation justifying such action, and this had the effect of curing any error that may have been made in ruling on the demurrer. The plaintiff testified that he took care of the rental each Saturday night until the defendants forced him to leave the premises by threatening to take his life, by attempting to do him bodily harm and by cutting off the lights and gas used in the stand, and it was undisputed that he paid $100 to Mr. Kelly the day the deal was closed and the remaining $50 to the defendants for him at the rate of $5 a week.

 It is next urged that the court committed error in permitting the plaintiff to testify over the objection of the defendants concerning declarations made by them while they were allegedly assaulting him, since such assaults did not, in the absence of a showing that they amounted to a physical expulsion of him from the premises, constitute a forcible eviction. The gist of the testimony upon which this assignment is based, the statement of the plaintiff relative to his eviction, is that Mrs. Turpin came to the stand on the afternoon of Friday, October 7th, and told him they wanted it back because Fair Week was coming on and they wanted to sell everything and that when he declined to leave the premises she became hysterical, called him all kinds of names and threatened to kill him if he did not get out. The following day, Saturday, he went up town in the afternoon to buy supplies

for the restaurant to last him over Saturday and Sunday and when he returned with them about nine o'clock that night the defendant, J. F. Turpin, was behind the counter and said to him, "You dirty s—— of a b—— you are not coming in here. This is my place and you are going to stay out of it." The plaintiff placed his meat in the refrigerator, however, and replied that he had the place, would run it that night and would be back at seven o'clock the next morning, Sunday, whereupon the defendant, J. F. Turpin, said, "I will be here with a gun. You are not coming in this place any more," and then became so angry that he struck at the plaintiff with six platters but the blow was avoided by the latter's ducking. The plaintiff came back at seven o'clock the next morning and found no one there but the boy working for him, but about eight or nine o'clock Mrs. Turpin came to the stand and said, "We told you not to come back and you are here," to which he replied, "Yes, it is my place and I am entitled to come here." She then called her husband who came and again threatened plaintiff's life, cursed him, saying he was going to shoot him whether he stayed there or not, and then cut off the lights and gas in the stand and refused to turn them on again. He then went into the house for a gun and Mrs. Turpin attempted to get a butcher knife but failed since it was hidden from her under the counter by the boy working there, and about two that afternoon, Sunday, plaintiff went up town to see his attorney and while away had one C. A. Adams remain in the stand, saying to him as he left, "I am not safe to stay there because these people are hysterical and crazy, and I don't want to be killed yet." Upon returning to the place about an hour or so later he stated to Adams, "Let's go, it's all over," and left. He did not go there again but

shortly afterwards filed this action. His testimony regarding the eviction was corroborated in some of its main features by other witnesses, though the defendants denied the threats and the attempted use of force but did admit cutting off the gas and wanting the plaintiff to surrender the stand to them. Mrs. Turpin testified they offered to pay him for the stock, which inventoried around $15, and the radio whose value was small, probably around $10, but he refused to surrender the stand unless he was paid the amount he gave Mr. Kelly, $150, nearly all of which was for the privilege of running the business.

It is the contention of the defendants that if these acts show an eviction at all it is not a forcible but a constructive eviction only and, hence, they were not admissible as proof of an allegation based on the former. It is true that the cutting off of the gas and the lights by the landlord, which had the effect of rendering the premises useless for the purposes for which the plaintiff had leased them, constituted merely a constructive eviction (McAdam on Landlord and Tenant, vol. 2, p. 1418), but when, in addition to this, the lessor attempted to do him bodily harm and threatened to kill him in order to force him to give up the premises, any reasonable person, it occurs to us, would feel that this was sufficient force to constitute a forcible eviction. The threat to shoot him, or to use a gun to prevent his coming in the place any more for the purpose of compelling him to give up the premises, was, practically speaking, just as much a use of force as the physical expulsion of him by the application of manual strength would have been. While it is true that he remained at the stand some hours after the threats had been made and bodily harm attempted and that he was not compelled to walk away at the point of a gun or as the

result of physical force actually applied, yet his testimony as a whole is hardly susceptible of any other construction than that he went away because he was fearful that the defendants would either kill or do him serious bodily harm. In fact, he stated to the man in charge as he went to see his attorney at two o'clock Sunday afternoon, ''I am not safe to stay there because these people are hysterical and crazy, and I don't want to be killed yet.'' Threats of violence or bodily injury do, as the court correctly told the jury, amount to eviction by force. There was no error in the ruling of the court admitting the testimony complained of.

The answer was a general denial but the defendants sought to introduce under it testimony showing that plaintiff bootlegged and ran a dirty, unsanitary place, and the court, being of the view that this constituted an affirmative defense that could not be shown under a general denial, sustained an objection to it, stating that if the defendants wished to rely on such a defense they should have pleaded it. This ruling is made the basis of one of the assignments, the defendants contending that they had a right under their general denial to make this proof, but as we view it, there was no error in the court's refusal. The gist of the cause of action was that the defendants unlawfully, wrongfully and forcibly evicted the plaintiff from the premises which he held under a lease from them, and the existence of the lease and plaintiff's possession under it up to the 8th or 9th of October, though put in issue by the general denial, was not questioned by the defendants at the trial, but forcible eviction was. The purport of the defendants' testimony was that the plaintiff gave up the premises voluntarily, though they admitted facts showing that they were perhaps guilty of constructive eviction.

This was immaterial, however, because it was in no sense a defense to the allegation that they had forcibly evicted the plaintiff through the use of violence and threats to take his life. That some of their acts may have amounted to a constructive eviction does not mean that others of them did not constitute a forcible eviction. In fact, under the evidence they could have been and perhaps were guilty of both, but the fact that some of his acts may have justified a constructive eviction did not authorize an eviction by force. The fact that the plaintiff could not under the terms of the lease run a dirty, unsanitary place, bootleg or even default in the payment of rent, gave the defendants no right, in case he did do any of these things, to evict him by force. The statute provides a remedy by which a landlord may, upon the default of the tenant and his refusal to surrender, recover possession of the premises. Sections 4311 to 4325, Revised Code of 1928.

Even if the pleading had been based on a constructive eviction the evidence in question would not have been admissible unless it had been pleaded. "A defense based on the misconduct of the tenant justifying his eviction," to use the language of 36 C. J. 276, paragraph 1013, "must be pleaded in order to be proved." In *Lay* v. *Great Southern Lumber Co.,* 118 Miss. 636, 79 So. 822, subdivision 1 of the syllabus reads:

"In action for eviction, where plaintiff alleged that it leased shop for an indefinite period on monthly rental basis, and that defendant, without notice to terminate, entered premises while plaintiff was temporarily absent and nailed up door, defendant could not prove that premises were to be occupied only during plaintiff's good behavior, and that premises were closed because of plaintiff's misconduct, without specially pleading such facts."

The only theory upon which the alleged violations of the lease might have been admissible, if at all, was in mitigation of damages, but they were not offered for that purpose. However, the defendants had the benefit of this testimony anyway, because J. F. Turpin was later permitted to testify that they "put plaintiff out" because "he was selling whiskey there" after "I told him not to sell it"; because the place "was dirty and filthy, too" and because of "back light and back rent and all." And the witness, Walter Cross, who was present on July 10th when the $100 was paid to Kelly and the bill of sale from him to the plaintiff delivered, testified that the defendant J. F. Turpin, said to plaintiff at that time: "There is one thing that has got to be done, we have got to keep this stock up and keep the lights burning and put up a deposit for electricity and gas" and "there shall be no booze sold in this place." The court did not later take a different view of the admissibility of this evidence, but the plaintiff himself brought it out afterwards by cross-examining J. F. Turpin, and the statement of Walter Cross was a part of a conversation between the parties heard by him the day the lease was signed and delivered.

Complaint is made of certain instructions but, in view of what is said in disposing of the foregoing assignments, it is not necessary to discuss them.

It is urged finally that damages in the sum of $400 were excessive and could not have been awarded except as the result of the prejudice created by the errors committed at the trial, special reference here being made to the evidence of the curses and assaults of the defendants. There was, as we have seen, no error in the admission of this testimony, hence it was not merely the right but the duty as well of the jury to consider it. The evidence of the plaintiff was

that he was making about $10 a day while he ran the stand; that the State Fair was coming on within twelve or fifteen days from October 9th and the stand, being located where the people going in and out of the Fair Grounds passed in front of it, would have done a much more profitable business than this during that week. It would appear, therefore, that the $400 in damages, which the jury found plaintiff suffered from the 9th of October until the trial, were not excessive. The assignment is, therefore, without error.

The judgment is affirmed.

LOCKWOOD, C. J., and ROSS, J., concur.